UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. S1-4:18 CR 565 CDP (JMB) |
| | ) | |
| DEMETRIUS TYRESE JOHNSON, | ) | Defendant #1 |
| CHRISTOPHER NICHOLAS PIPES, | ) | Defendant #3 |
| CHRISTOPHER GLEN RHODES, JR., and | ) | Defendant #9 |
| BRUCE EDWARD JOHNSON, | ) | Defendant #11 |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM AND RECOMMENDATIONS OF
UNITED STATES MAGISTRATE JUDGE CONCERNING
MOTIONS TO SUPPRESS WIRETAP AND PHONE LOCATION EVIDENCE**[1]

Currently before the Court are several suppression motions filed by four co-defendants[2] in this matter.  Defendant Demetrius Johnson filed a motion to suppress evidence related to wiretaps of nine telephone numbers.   (ECF No. 417)  Defendant Pipes filed a motion to suppress evidence related to wiretaps of six telephone numbers.  (ECF No. 359)  Defendant Rhodes filed a general motion to suppress all wiretap evidence.  (ECF No. 419)  Defendant Bruce Johnson filed a motion to suppress evidence pursuant to a search warrant for phone location data and other information associated with a cell phone he reportedly used.  (ECF No. 420)   The government opposes each pending motion.  (ECF Nos. 426, 427)

---

[1] Pretrial matters have been referred to the undersigned United States Magistrate Judge, under 28 U.S.C. § 636(b).

[2] Co-Defendant Sharonda Moore also filed a motion to suppress wiretap evidence (ECF No. 368) but she withdrew that motion (ECF Nos. 442, 443).

## RELEVANT PRODECURAL BACKGROUND AND FINDINGS OF FACT

The Superseding Indictment in this case involves allegations of a large-scale drug trafficking conspiracy.  The Indictment also alleges a variety of other crimes including money laundering and firearms offenses, including murder.  The discovery is voluminous, detailed, and complex.  After consulting with the attorneys for all parties, the Court issued a scheduling order that contemplated filing pretrial motions in phases.  The first phase covered legal motions that would not require any evidentiary hearings to resolve.  The first phase has been completed.  The second phase contemplated motions to suppress electronic surveillance evidence, such as wiretap evidence.  The present Memorandum and Recommendations address the second phase challenging electronic surveillance evidence.

On June 17, 2019, the Court held an evidentiary hearing on the wiretap motions filed by Demetrius Johnson and Pipes.[3]  Demetrius Johnson was present with his attorneys William Margulis and Justin Gelfand.  Pipes was present with his attorney John Stobbs.  The government was represented by AUSAs Angie Danis and Lisa Yemm.  At the outset of the hearing, and with the agreement of defense counsel, the government offered into evidence five binders containing 63 exhibits, which comprised the applications, affidavits, orders, and other documents related to the wiretaps at issue herein.  Some of the exhibits were redacted to remove information that might identify confidential sources.  A copy of that exhibit list is attached hereto as "Exhibit List – Evidentiary Hearing June 17, 2019."[4]

---

[3] Pipes's motion to suppress wiretap evidence was directed to a subset of the telephone numbers challenged in Demetrius Johnson's motion to suppress.

[4] Because the government's exhibit numbers overlapped between hearings, the undersigned will refer to exhibits by the hearing date as well as the exhibit number.

At the June 17th hearing, the government presented the testimony of two witnesses: DEA Special Agent Julie Olmsted ("S/A Olmsted") and FBI Special Federal Officer Michael Betz ("SFO Betz").  As of the hearing date, S/A Olmstead had been a federal agent for about seven years, with experience conducting drug investigations in New Mexico and St. Louis, MO, and SFO Betz had been an officer with the St. Louis Metropolitan Police Department for about seventeen years and an FBI task force officer for about four years.

During the morning of June 20, 2019, the Court held a hearing to address Rhodes's motion to suppress.  Rhodes appeared in person with his attorney, David Bruns.  At that hearing, Rhodes's counsel acknowledged that there were no records indicating that Rhodes had been intercepted during any wiretap in this case and that the matter could be resolved on the existing record before the Court.  Accordingly, no further evidence or testimony was received relative to Rhodes's general challenge to the introduction of wiretap evidence in this matter.

During the afternoon of June 20, 2019, the Court held an evidentiary hearing which focused solely on the issues raised in Bruce Johnson's motions to suppress evidence obtained pursuant a Phone Location Warrant directed to a cell phone he used.  Bruce Johnson was present with his attorney, Levell Littleton, and the government was represented by AUSAs Lisa Yemm and Angie Danis.  The government introduced testimony and evidence through a single witness, Patrick Riordan, an officer with the St. Louis Metropolitan Police Department and an FBI Special Federal Officer ("SFO Riordan").  As of June 20, 2019, SFO Riordan had been a police officer for about eleven years and an FBI task force officer for about four years.  The government also introduced eleven exhibits related to the PLW warrants at issue.

Bruce Johnson also moved for a hearing pursuant to Franks v. Delaware, 438 U.S. 154, 155-56 (1978).  After hearing from counsel and allowing Bruce Johnson to make a record on his

request, the undersigned found that Bruce Johnson was not entitled to a <u>Franks</u> hearing and limited defense counsel's cross-examination of SFO Riordan.[5]

## I.   <u>Title III Wiretaps Under Consideration</u>

Each of the wiretaps at issue were applied for between December 2017 and June 2018, pursuant to a joint DEA/FBI investigation into drug trafficking activities in the St. Louis, Missouri area.  The investigation focused on the area in and around the Clinton Peabody low-income housing neighborhood, which is in the City of St. Louis, south of the downtown area.

The following subsections summarize the wiretap applications and orders that were challenged by Co-Defendants Demetrius Johnson and Pipes.  The subsections also address the June 17, 2019, hearing evidence and testimony.   Co-Defendant Rhodes acknowledged that none of his conversations were intercepted.  The issue of Rhodes's standing to raise any wiretap challenges is addressed separately in the Discussion and Analysis of Issues Presented below.

### A.   <u>TT #1 - 314-704-7992; TT #2 - 314-319-9166</u>
   4:17 MC 778 AGF (Challenged by Demetrius Johnson)

On December 22, 2017, Special Assistant United States Attorney (SAUSA) Angie Danis appeared before the Honorable Audrey G. Fleissig, United States District Judge, and submitted an Application for the Initial Interception of Wire and Electronic Communications relating to telephone number 314-704-7992, which was referred to as Target Telephone #1 (TT #1), and telephone number 314-319-9196, which was referred to as Target Telephone #2 (TT #2).  The

---

[5] Bruce Johnson also moved for sanctions for possible discovery issues.  At the June 20th hearing, it became clear to all involved that the government provided redacted copies of certain records to Bruce Johnson.  Those redactions were done in white rather than black, which caused some confusion for the Court and Bruce Johnson.  The government did not act in bad faith and all information was provided to counsel for Bruce Johnson in time to adequately address the issues raised in his motion.  The undersigned denied sanctions on the record because there was no misconduct or bad faith conduct.

application was accompanied by a 69-page affidavit of DEA S/A Julie Olmsted, which was signed and sworn to before Judge Fleissig on June 22, 2017.[6]

Special Agent Olmstead's affidavit was extensive and addressed numerous facts and circumstances concerning the drug trafficking investigation and the proffered need to monitor wire and electronic communications over TT #1 and #2.  Among other details, the affidavit identified several targets of the investigation, including Marquise Brown, Demetrius Johnson, and John Valenti (who are each named defendants in the superseding indictment in this matter). The affidavit provided detailed information relating to each of these targets.  For example, the affidavit explained that a source of information ("SOI") identified Demetrius Johnson as a supplier of fentanyl to Brown within the Clinton-Peabody housing projects, in the City of St. Louis.  The affidavit identified a telephone number that Demetrius Johnson was then using and provided other details linking Demetrius Johnson to a drug transaction.  The affidavit explained that both TT #1 and TT #2 were being used by Marquise Brown.  The affidavit also stated that the target offenses under investigation involved violations of 21 U.S.C. §§ 841(1)(1), 843(b), 846, and 848 (drug trafficking offenses), and 18 U.S.C. §§ 1956, 1957 (money laundering offenses), 922, and 924 (firearm offenses).  The affidavit identified how monitoring communications over TT #1 and TT #2 would identify and provide admissible evidence related to the investigation.

---

[6] On December 28, 2017, the government presented an amended application with an amended affidavit of S/A Olmstead.  The amended application explained that the physical device associated with TT #1 had changed, which resulted in a new mobile equipment identifier ("MEID") being assigned to TT #1.  Judge Fleissig signed an accompanying Amended Order authorizing interception.  The parties have not identified any significance to this amendment relative to any suppression motion.

The affidavit also outlined facts and circumstances supporting probable cause for the issuance of a wiretap order for TT #1 and #2.  The factual recitation was extensive and summarized, among other things, controlled purchases of narcotics from Brown using TT #1[7] and calls from Brown to Demetrius Johnson using TT #2.  The affidavit explained that Brown was likely using TT #1 for drug sales and TT #2 to contact his sources of supply.  The affidavit also outlined various surveillance activities relating to Brown and other investigative techniques associated with TT #1 and #2, such as reviewing telephone toll records.  The affidavit also provided a summary of calls and texts over TT #1 between Brown and a confidential source which related to drug sales.

S/A Olmstead's affidavit clearly established that TT #1 and #2 were being used in the drug trafficking and related criminal activities under investigation and that monitoring voice and text message content would lead to the discovery of relevant evidence.

The affidavit also explained why wiretaps were needed for TT #1 and #2 in this case.  In this regard, the affidavit considered the efficacy and limitations of other investigatory techniques, including controlled purchases, physical surveillance, pole cameras, cooperating sources and undercover investigators, subject interviews, Grand Jury subpoenas to compel information, search warrants, pen-trap and telephone toll analysis, trash searches, tracking devices and phone location monitoring, financial investigation, and mail covers.  In each case, the affidavit explained why a particular technique might be useful but would either be risky or fall short of achieving the goals of the investigation.  For example, the affidavit explained that these methods were not likely to disclose the higher-level distributers, and that many of these methods, if used,

---

[7] According to the affidavit, between May 2017 and December 2017, investigators arranged for ten controlled purchases from Brown using TT #1.

were risky in that the method could compromise the entire investigation.  Similarly, the affidavit acknowledged how various methods would be useful but would still not provide important details or fall short of the larger goals of the investigation.  For example, the affidavit explained that phone analysis would reveal proof of contacts and communications but not the context of those communications which would be needed to identify specific roles of persons within the drug trafficking organization.

Upon consideration of the affidavit and application, Judge Fleissig signed an order authorizing the initial interception of wire and electronic communications over TT #1 and #2.  In her order, Judge Fleissig found probable cause to support the interception and that the government "had established that normal investigative procedures have been tried and have failed, reasonably appear to be unlikely to succeed if tried, or are too dangerous to employ." (Evid. Hrg. 6.17.2019 Gov't Exh. 7 at 4)

Monitoring began on December 26, 2017.  The government submitted 10-Day reports[8] on January 5, 2018, January 16, 2018, and January 25, 2018.

On January 23, 2018, SAUSA Danis submitted an Application for the Continued Interception of Wire and Electronic Communications over TT #1 and #2.  This application was submitted to the Honorable Ronnie L. White, United States District Judge, and was accompanied by a detailed and lengthy Affidavit in Support by S/A Olmstead.  Among other things, the affidavit summarized numerous intercepted calls and text messages from the initial wiretap for

---

[8] Pursuant to 18 U.S.C. § 2518(6), the District Court ordered the government to submit reports every ten days indicating the progress that has been made toward achieving the goals stated in the application.  Such "10-Day Reports" typically include a statistical summary of the calls intercepted, indicating pertinent and non-pertinent calls and similar information.  The 10-Day reports also typically include a summary of conversations intercepted.  For a text message, that summary may reflect an entire conversation.  For a voice call, the summary may be a transcript of the conversation or a synopsis of the pertinent portions of that conversation.

TT #1 and #2.  The affidavit also included numerous paragraphs explaining in detail the need to continue intercepting calls and text messages over TT #1 and #2.

Upon consideration of the affidavit and application, Judge White signed an order authorizing the continued interception of wire and electronic communications over TT #1 and #2.  In his order, Judge White found probable cause to support the interception and that the government "had established that normal investigative procedures have been tried and have failed, reasonably appear to be unlikely to succeed if tried, or are too dangerous to employ." (Evid. Hrg. 6.17.2019 Gov't Exh. 13 at 4)

The government continued monitoring TT # 1 and #2, and submitted its fourth and fifth 10-Day Reports on February 5, 2018 and February 12, 2018.  (Evid. Hrg. 6.17.2019 Gov't Exhs. 14, 15)  On February 22, 2018, the government filed its sixth and final 10-Day Report, as well as a Sealing Application.  (Evid. Hrg. 6.17.2019 Gov't Exhs. 16, 17)  On February 22, 2019, the Honorable Henry E. Autrey, United States District Judge, signed a Sealing Order for TT # 1 and #2.  (Evid. Hrg. 6.17.2019 Gov't Exh. 18).

At the June 17th, evidentiary hearing, the government submitted a copy of a minimization guidance letter, dated December 22, 2017, from SAUSA Angie Danis and addressed to S/A Julie Olmstead, DEA, as well as Monitoring Agents and Officers.  (Evid. Hrg. 6.17.2019 Gov't Exh. 4)  The subject of the letter was "Guidelines for the Conduct of Wire and Electronic Surveillance of Cellular Telephone Facilities (314) 704-7992 and (314) 319-9166" and will be referred to as a "minimization letter."  (Id.)  S/A Olmstead testified that SAUSA Danis also conducted an in-person minimization meeting.[9]

---

[9] Based on the testimony of S/A Olmstead and SFO Betz, the undersigned finds that SAUSA Danis conducted minimization meetings each time the Court authorized the interception of communications over a new phone number.  In addition to the detailed guidance and

Among other things, the minimization letter for TT #1 and #2 noted that S/A Olmstead, as the Supervising Officer, had the primary responsibility for ensuring that participating agents knew the contents of the court order and their responsibilities thereunder.  The minimization letter also requested that each agent and deputized personnel "who may become involved in the electronic surveillance phase of this investigation thoroughly read the affidavit, application, order and this letter."  (Id.; emphasis in original)  The minimization letter provided guidance for monitoring calls and minimizing (i.e., not monitoring) calls that did not concern criminal activities.  The letter provided guidance for protecting against the interception of legally privileged communications, with specific guidance concerning the attorney-client privilege, clergyman-parishioner privilege, the doctor-patient privilege, and the marital privilege.  The letter provided guidance and requirements regarding maintaining records and logs of the interceptions and periodic reporting requirements.  The letter also provided specific guidance relative to the interception of text messages.  Prior to participating in the electronic surveillance of TT #1 and #2, each monitor was required to sign and date a log certifying that the monitor had read and understood the guidance in SAUSA Danis's minimization letter.  There were two certification logs—one for wire interceptions (i.e., voice communications) and one for electronic message interceptions (i.e., text messages).  Many of the signatories reflected in these logs indicated an affiliation with "MVC."  Based on the testimony at the evidentiary hearings in this

---

procedures outlined in SAUSA Danis's minimization guidance letters, both S/A Olmstead and SFO Betz testified regarding the general procedure regarding minimization, and explained that knowledgeable case agents were available to assist monitors in determining whether a communication was pertinent or non-pertinent to the investigation.  (See Evid. Hrg. 6.17.2019 Tr. at 14, 17, 50-51)

matter, the undersigned finds that MVC is a contractor used to assist in monitoring court authorized wiretaps.[10]

**B.**   **TT #6 - 314-537-0649; TT #7 – 314-745-9785; TT #8 – 314-699-1323**
4:18 MC 222 CDP (Challenged by Demetrius Johnson & Pipes)

On March 20, 2018, SAUSA Danis presented an Application for the Initial Interception of Wire and Electronic Communications over three telephone numbers, namely:  314-537-0649, referred to as Target Telephone #6 (TT #6); 314-745-9785, referred to as Target Telephone #7 (TT #7); and 314-699-1323, referred to as Target Telephone #8 (TT #8).  This Application was made to the Honorable Catherine D. Perry, Senior United States District Judge.  The Application was accompanied by an affidavit of FBI Special Federal Officer Michael Betz, an Officer with the St. Louis Metropolitan Police with more than 15 years of experience.  SFO Betz signed and swore to the affidavit before Judge Perry.

At 100 pages in length, SFO Betz's affidavit was extensive and detailed.  The affidavit identified the nature and target subjects of the drug trafficking investigation.  The target subjects listed included numerous persons charged in the instant Superseding Indictment, including Demetrius Johnson and Christopher Pipes.  The affidavit represented that Demetrius Johnson and others used TT #6, #7, and #8.  The affidavit also summarized the results of prior wiretap authorizations, including those related to TT #1 and #2.  The affidavit explained how TT #6, #7, and #8 were identified and tied to Demetrius Johnson and the drug trafficking organization, and how these telephone numbers were used in connection with drug trafficking activities.  The affidavit summarized several calls made to one or more of these target telephone numbers to

---

[10] See 18 U.S.C. § 2518(5) (last sentence) ("An interception under this chapter may be conducted in whole or in part by Government personnel, or by an individual operating under contract with the Government, acting under the supervision of an investigative or law enforcement officer authorized to conduct the interception.").

conduct controlled purchases by undercover officers, as well as intercepted jail calls involving these numbers.  The affidavit further summarized call analysis conducted relative to TT #6, #7, and #8, such as pen register and common call analyses, and the results of other legal process concerning these numbers, including phone location warrants.

Overall, the affidavit established that TT #6, #7, and #8 were then being used in drug trafficking and related criminal activities under investigation and that monitoring voice communications and text messages would lead to the discovery of relevant evidence.

Regarding the necessity of additional wiretaps, SFO Betz's affidavit addressed the possibility of using conventional, non-wiretap, methods and procedures.  SFO Betz's affidavit considered the results of prior wiretaps for TT #1 and #2, as well as the efficacy and limitations of physical surveillance, the use of tracking devices (both telephonic and GPS-based), trash pulls, Grand Jury process, confidential informants and sources, undercover agents, search warrants and consent searches, subject and witness interviews, telephone air-time and similar analyses, police records, and financial investigation techniques.  In each case, SFO Betz's affidavit explained why a particular technique might be useful but would either be risky or fall short of achieving the goals of the investigation.

Upon consideration of the affidavit and application, Judge Perry signed an order authorizing the initial interception of wire and electronic communications over TT #6, #7, and #8.  In her order, Judge Perry found probable cause to support the interception and that the government "had established that normal investigative procedures have been tried and have failed, reasonably appear to be unlikely to succeed if tried, or are too dangerous to employ." (Evid. Hrg. 6.17.2019 Gov't Exh. 21 at 5)

Monitoring began on March 21, 2018.  The government submitted 10-Day Reports on April 3, 2018, April 10, 2018, and April 21, 2018.  The reports included more than 100 pages of reporting data and information.  On April 21, 2018, the government also submitted a Sealing Application relative to TT #6.  Also on April 21, 2018, Judge Fleissig signed a Sealing Order for TT #6.

At the June 17th evidentiary hearing, the government submitted a copy of a minimization guidance letter dated March 20, 2018, from SAUSA Angie Danis and addressed to SFO Michael Betz, FBI, as well as Monitoring Agents and Officers.  (Evid. Hrg. 6.17.2019 Gov't Exh. 22)  The subject of the letter was "Guidelines for the Conduct of Wire and Electronic Surveillance of Cellular Telephone Facilities (314) 537-0649, (314) 745-9785, and (314) 699-1323."  (Id.)

As was the case with TT #1 and #2, the minimization letter for TT #6, #7, and #8 required each person participating in the electronic surveillance to sign and date a log certifying that the monitor had read and understood the guidance in SAUSA Danis's minimization letter.  There were separate certification logs for wire interceptions (voice communications) and electronic message interceptions (text messages).  The minimization letter for TT #6, #7, and #8 is substantially similar to the letter provided relative to TT #1 and #2.

**C.**  **TT #7 – 314-745-9785; TT #8 – 314-699-1323; TT #9 – 314-297-6893**
     4:18 MC 222 CDP (Challenged by Demetrius Johnson & Pipes)

On April 19, 2018, SAUSA Danis presented an Application for the Continued and Initial Interception of Wire and Electronic Communications over three telephone numbers.  The Application requested continued interception over 314-745-9785 (TT #7) and 314-699-1323 (TT #8), and the initial interception over 314-297-6983, referred to as Target Telephone #9 (TT #9).  The Application was made to Judge Fleissig.  The Application was accompanied by an affidavit of SFO Betz.  SFO Betz signed and swore to the affidavit before Judge Fleissig.

Comprising 102 pages, SFO Betz's affidavit addressed the relevant considerations associated with an application for a wiretap order.  The affidavit identified the nature and target subjects of the drug trafficking investigation, and identified new target subjects who had been identified since the prior application, including co-defendant Bruce Johnson.  The affidavit summarized the results of prior wiretap authorizations, including for TT #1, #2, #6, #7, and #8.[11] The affidavit explained how TT #7, #8, and #9 were used in the drug trafficking activities of Demetrius Johnson and the other targets.  The affidavit summarized controlled purchases of narcotics and provided summaries of numerous, pertinent drug-related interceptions over TT #7, #8, and #9.  The affidavit summarized call analyses conducted relative to TT #9, such as pen register and common call analyses.

The undersigned finds that SFO Betz's affidavit clearly established that TT #7, #8, and #9 were then being used in the drug trafficking and related criminal activities under investigation and that monitoring voice and text message communications over those telephone numbers would lead to the discovery of relevant evidence.

SFO Betz's affidavit also addressed the necessity of the continued use of wiretaps rather than solely relying on traditional investigative techniques and methods.  Like his prior affidavit, SFO Betz provided specific and general reasons why the investigators believed that the continued use of wiretaps was necessary to achieving the overall and larger goals of the investigation.  As with his prior affidavit (for TT #6, #7, and #8) SFO Betz also addressed a variety of traditional techniques and methods.

---

[11] SFO Betz explained that the investigation team had concluded that TT #6 was being used by lower level members of the drug conspiracy, and therefore did not seek to continue monitoring communications over that telephone number.  (See Evid. Hrg. 6.17.2019 Gov't Exh. 29 at 9)

Upon consideration of the affidavit and application, Judge Fleissig signed an order authorizing the continued interception of wire and electronic communications over TT #7 and #8, and the initial interception of communications over TT #9.  In her order, Judge Fleissig found probable cause to support the interception and that the government "had established that normal investigative procedures have been tried and have failed, reasonably appear to be unlikely to succeed if tried, or are too dangerous to employ."  (Evid. Hrg. 6.17.2019 Gov't Exh. 30 at 5)

On April 19, 2018, as a result of Judge Fleissig's wiretap order, monitoring continued on TT #7 and #8, and began on TT #9.  On April 30, 2018, the government submitted the fourth 10-Day Report for TT #7 and #8, and the first 10-Day Report for TT #9.  The government submitted additional 10-Day Reports for these telephone numbers on May 9, 2018, and May 21, 2018.  On May 21, 2018, the government also submitted a Sealing Application relative to TT #7, #8, and #9.  The Honorable John A. Ross, United States District Judge, signed a corresponding Sealing Order on the same date.

At the June 17th evidentiary hearing, the government submitted a copy of a minimization guidance letter dated April 19, 2018, from SAUSA Angie Danis and addressed to SFO Michael Betz, FBI, as well as Monitoring Agents and Officers.  (Evid. Hrg. 6.17.2019 Gov't Exh. 31) The subject of the letter was "Guidelines for the Conduct of Wire and Electronic Surveillance of Cellular Telephone Facilities (314) 745-9785 and (314) 699-1323 and (314) 297-6983."  (Id.)

Like the minimization letters discussed above, the April 19, 2018, minimization letter required each person participating in the electronic surveillance to sign and date a log certifying that the monitor had read and understood the guidance in SAUSA Danis's minimization letter. There were separate certification logs for wire interceptions (voice communications) and electronic message interceptions (text messages).

-14-

**D.**     **TT #10 - 314-391-3871**
4:18 MC 341 JAR (Challenged by Demetrius Johnson & Pipes)

On May 8, 2018, SAUSA Danis appeared before Judge Ross and presented an Application for the Initial Interception of Wire and Electronic Communications over 314-391-3871, referred to as Target Telephone #10 (TT #10).  The Application was accompanied by an affidavit of S/A Julie Olmstead, which was signed and sworn to before Judge Ross.

Special Agent Olmstead's affidavit covered 83 pages and addressed the relevant factual considerations necessary for obtaining wiretap authorization.  Like the other wiretaps at issue, the affidavit for TT #10 summarized the results of prior wiretap applications, the persons expected to be intercepted, confidential sources used during the investigation, and the results of controlled drug purchases.  The affidavit included numerous, detailed examples of how cellular telephone communications were used in furtherance of the drug trafficking activities under investigation, and specifically how TT #10 had been used, including by Pipes for drug-trafficking conversations with Demetrius Johnson (who was using, for example, TT #7 and TT #9 to communicate with Pipes).  The affidavit also summarized air-time, pen register, and location-based analyses conducted regarding TT #10.

S/A Olmstead's affidavit clearly established that TT #10 was then being used in the drug trafficking and related criminal activities under investigation and that monitoring voice and text message content would lead to the discovery of relevant evidence.

S/A Olmstead's affidavit also addressed the necessity of the continued use of wiretaps in this investigation, as opposed to traditional investigative techniques and methods.  Like the prior affidavits discussed above, S/A Olmstead provided specific and general reasons why the investigators believed that the continued use of wiretaps was necessary to achieving the overall and larger goals of the investigation.

-15-

Upon consideration of the affidavit and application, on May 8, 2018, Judge Ross signed an order authorizing the initial interception of wire and electronic communications over TT #10. In his order authorizing the wiretap, Judge Ross found probable cause to support the interception and that the government "had established that normal investigative procedures have been tried and have failed, reasonably appear to be unlikely to succeed if tried, or are too dangerous to employ." (Evid. Hrg. 6.17.2019 Gov't Exh. 39 at 3)

Monitoring began on May 9, 2018. The government submitted 10-Day Reports on May 21, 2018, May 29, 2018, and June 8, 2018. The government also submitted a Sealing Application for TT #10 on June 8, 2018, and Judge White issued a Sealing Order on the same date.

On June 18, 2018, however, SAUSA Danis returned to Judge White with an Application for the Renewed Interception of Wire and Electronic Communications over TT #10. In support of the Application for Renewed Interception, the government submitted a 77-page affidavit of SFO Betz. The affidavit summarized the results of prior wiretap applications, including the earlier application for TT #10, and explained why the investigators believed that renewed interception of communications over TT #10 would lead to the discovery of evidence relevant to the on-going drug trafficking investigation.

On June 18, 2018, Judge White signed an order authorizing the renewed interception of wire and electronic communications over TT #10. Judge White found probable cause to support the interception and that the government "had established that normal investigative procedures have been tried and have failed, reasonably appear to be unlikely to succeed if tried, or are too dangerous to employ." (Evid. Hrg. 6.17.2019 Gov't Exh. 48 at 3)

-16-

The government renewed monitoring TT #10 on June 19, 2018, and submitted its fourth and fifth 10-Day Reports on June 29, 2018, and July 9, 2018.  On July 19, 2018, the government submitted its sixth and final 10-Day Report, as well as a Sealing Application.  Judge Autrey signed a Sealing Order relative to TT #10 on July 19, 2018.

At the June 17th evidentiary hearing, the government submitted two minimization guidance letters relative to TT #10 from SAUSA Danis.  The first, dated May 8, 2018, was addressed to S/A Julie Olmstead, DEA, Monitoring Agents and Officers.  (Evid. Hrg. 6.17.2019 Gov't Exh. 40)   The second, dated June 18, 2018, was addressed to SFO Betz, FBI, Monitoring Agents and Officers.  (Evid. Hrg. 6.17.2019 Gov't Exh. 49)  The subject of both letters was "Guidelines for the Conduct of Wire and Electronic Surveillance of Cellular Telephone Facility (314) 391-3871."  Like the minimization letters previously described, the May 8 and June 18, 2018, minimization letters required each person participating in the electronic surveillance to sign and date a log certifying that the monitor had read and understood the guidance in the minimization letters.  There were separate certification logs for wire interceptions (voice communications) and electronic message interceptions (text messages).

**E.**     **TT #11 - 314-541-4797; TT #12 - 314-941-6539**
           4:17 MC 778 AGF (TT #11 Challenged by Demetrius Johnson & Pipes; TT #12
           Challenged by Demetrius Johnson)

On June 18, 2018, SAUSA Danis appeared before Judge White and submitted the government's Application for the Initial Interception of Wire and Electronic Communications over 314-541-4797, referred to as Target Telephone #11 (TT #11), and 314-941-6539, referred to as Target Telephone #12 (TT #12).  The Application was accompanied by a 78-page affidavit of S/A Julie Olmstead, which was signed and sworn to before Judge Ross.

-17-

Special Agent Olmstead's affidavit addressed the relevant factual considerations necessary for obtaining wiretap authorization for TT #11 and #12.  Like the other wiretaps at issue, the affidavit for TT #11 and #12 summarized the results of prior wiretap applications, the persons expected to be intercepted, confidential sources used during the investigation, and the results of controlled drug purchases.  The affidavit included numerous examples of how cellular telephone communications were used in furtherance of the drug trafficking activities under investigation, and specifically how TT #11 and #12 had been used in drug-related conversations. The affidavit explained that the investigative team had determined that Co-Defendant Andre Smallwood was using TT #11 and #12.  The affidavit included examples of drug-related conversations between Smallwood (using TT #11) and Demetrius Johnson (who was using, for example, TT #7, #8, and #9 to communicate with Smallwood).  The affidavit also provided examples of communications between Smallwood (using TT #12) and Pipes (who was using TT #10).  The affidavit also summarized air-time and pen register analyses conducted regarding TT #11 and #12.

S/A Olmstead's affidavit clearly established that TT #11 and #12 were then being used in the drug trafficking and related criminal activities under investigation and that monitoring voice and text message content would lead to the discovery of relevant evidence.  Judge White signed an order authorizing the initial interception of wire and electronic communications over TT #11 and #12.  The order is dated June 18, 2018.  Among other things, in his order Judge White found probable cause to support the interception and that the government "had established that normal investigative procedures have been tried and have failed, reasonably appear to be unlikely to succeed if tried, or are too dangerous to employ."  (Evid. Hrg. 6.17.2019 Gov't Exh. 57 at 4)

-18-

Monitoring of TT #11 and #12 began on June 19, 2018.  The government submitted 10-Day Reports on June 29, 2018, July 9, 2018, and July 19, 2018.  On July 19th, the government also submitted a Sealing Application relative to TT #11 and #12, and Judge Autrey signed a corresponding Sealing Order on the same date.

At the June 17th evidentiary hearing, the government submitted a copy of a minimization guidance letter dated July 18, 2018, from SAUSA Angie Danis and addressed to S/A Julie Olmstead, DEA, Monitoring Agents, and Officers.  (Evid. Hrg. 6.17.2019 Gov't Exh. 58)  The subject of the letter was "Guidelines for the Conduct of Wire and Electronic Surveillance of Cellular Telephone Facilities (314) 541-4797 and (314) 941-9639."  The July 18th minimization letter required each person who participating in the electronic surveillance to sign and date a log certifying that the monitor had read and understood the guidance in the minimization letter. There were separate certification logs for wire interceptions (voice communications) and electronic message interceptions (text messages).

## II.   **Phone Location Warrants for 314-326-3138** (Bruce Johnson Only)

### A.   **Initial Application, Affidavit, and Warrant**

On April 2, 2018, SAUSA Danis applied to the undersigned U.S. Magistrate Judge for a Phone Location Warrant ("PLW") associated with a subject cellular telephone having the number 314-326-3138.  Generally speaking, the application requested a warrant that would compel the service provider for 314-326-3138 to disclose location data for a period of 45 days going forward and historical location data for 30 days prior to the application.  The application also requested non-location information related to the number 314-326-3138, such as basic subscriber information, call records, and pen register and trap-and-trace records.  (See Evid. Hrg. 6.20.2019 Gov't Exh. 1a)

-19-

In support of the application for the PLW, the government submitted an affidavit of SFO Patrick Riordan.  (See Evid. Hrg. 6.20.2019 Gov't Exh. 1b)  Near the beginning of his affidavit, SFO Riordan represented that his affidavit was submitted to establish probable cause to monitor the location of 314-326-3138 and did not set forth all of his knowledge regarding the matter.  (Id. at 2)  The affidavit further represented that 314-326-3138 "has been used, and is presently being used, in connection with the commission of offenses involving ongoing violations of Title 21, United States Code, 841(a)(1) and 846 …, by **Bruce JOHNSON** … and others known and unknown."  (Id.; emphasis in original)

SFO Riordan's affidavit included about eight pages of facts and circumstances purporting to provide probable cause.  SFO Riordan affidavit explained that he was investigating drug trafficking by persons associated with the 14 Peabody Bloods gang, which distributed heroin and fentanyl "in St. Louis City, near the Peabody Housing Projects, and in some areas of St. Louis County."  (Id. at 3)  SFO Riordan further explained that "members of the 14 Peabody Bloods use multiple cellular telephone numbers to coordinate their narcotics transactions and commonly compartmentalize their narcotics trafficking utilizing one cellular phone for contact with buyers and one phone for contact with other distributors and/or suppliers."  (Id.)  SFO Riordan also explained that the members of the gang sometimes used "dope phones" for selling drugs, and those dope phones were passed around so that different individuals might have a particular phone on different days.  (See id. at 3-4)

SFO Riordan's affidavit also summarized information from two confidential sources, referred to as CS-4 and CS-5.  According to the affidavit, CS-4 advised that Demetrius Johnson was in charge of the 14 Peabody Bloods group selling drugs, and that one of the cell phones used

-20-

by Demetrius Johnson had the number 314-537-0649.[12]  (Id. at 4)  The affidavit further explained that CS-4 had observed a person, later identified to be Bruce Johnson, enter a residence at 1426 Peabody Ct. in January 2018, and that Bruce Johnson had been released from prison and placed on parole in January 2018.  (Id. at 6)

CS-5 indicated that Demetrius Johnson routinely possessed numerous cell phones, including the aforementioned phone bearing the number 314-537-0649, as well as 314-565-8330.  CS-5 explained that Demetrius Johnson rented out cell phones to those who worked for him.  CS-5 also explained that Demetrius Johnson was careful and that CS-5 did not know all of Demetrius Johnson's phone numbers.  CS-5 provided additional details concerning Demetrius Johnson's drug trafficking activities, including the names of persons working with him in the street-level distribution of narcotics.  (Id.)  According to SFO Riordan's affidavit, CS-5 also represented that Bruce Johnson is Demetrius Johnson's brother and that Demetrius Johnson allowed Bruce Johnson to take possession of group cell phones to conduct narcotics transactions so that Bruce Johnson could earn some money after his release from prison.  (Id. at 6)  SFO Riordan also stated that CS-5 represented that he/she had observed Bruce Johnson possessing narcotics near the 4700 block of Nebraska.  (Id.)

SFO Riordan's affidavit included summaries of recorded telephone calls involving the subject cellular telephone—314-326-3138.  One such recording occurred during the morning of March 17, 2018.  That call was between an inmate at the St. Louis City Justice Center named Jeremy Dickerson ("Dickerson") and Bruce Johnson, who was using the subject telephone (314-

---

[12] This phone number is discussed above in connection with the wiretap for TT #6.

326-3138).[13]  That call was monitored by the jail and SFO Riordan's affidavit included a transcript of that conversation.  In the transcript, Dickerson explained the circumstances of his recent arrest.  Dickerson also described the police who chased him and told Bruce Johnson that the police had asked him about Demetrius Johnson.  In response, Bruce Johnson stated that he was going to call Demetrius.  (Id. at 7)

In his affidavit, SFO Riordan interpreted and explained the significance of this recorded call.  SFO Riordan explained that, after Dickerson obtained narcotics from Demetrius Johnson, Dickerson fled the police but he was arrested after an accident, and Dickerson advised Bruce Johnson that the arresting officers questioned Dickerson about Demetrius Johnson.  (Id. at 8) SFO Riordan then represented that "[u]pon hearing this, Bruce Johnson contacted Demetrius Johnson to make him aware of the knowledge the police had relative to his criminal activities." (Id.)  It is this representation that Bruce Johnson contends is materially misleading and entitles him to a Franks hearing.

The affidavit does not include a transcript of Bruce Johnson contacting Demetrius Johnson.  At the evidentiary hearing, the Court received a copy of the recording of the call between Dickerson and Bruce Johnson.  Although it is hard to hear with perfect certainty, it appears that Bruce Johnson or someone with or affiliated with him did, in fact, contact Demetrius Johnson.  But it also appears that Bruce Johnson did not use the number 314-326-3138 (the subject of the PLW) to call Demetrius Johnson.  The undersigned finds that SFO Riordan's statement that Bruce Johnson contacted his brother to make him aware of what he learned from Dickerson was literally true.  The question of whether that statement was also

_____

[13] At the June 20th evidentiary hearing, the parties had no dispute that it was Bruce Johnson who was the person speaking to Dickerson.  (Evid. Hrg. 6.20.2019 Tr. at 17)

-22-

misleading because it failed to advise the Court that Bruce Johnson did not use 314-326-3138 to call his brother is discussed further below.

In addition to the jailhouse call from Dickerson to Bruce Johnson, SFO Riordan's affidavit also summarized a March 27, 2018, call from Bruce Johnson (using 314-326-3138) to Demetrius Johnson (using 314-745-9785).[14]  According to SFO Riordan, Demetrius and Bruce Johnson discussed someone who offended Demetrius Johnson, and Bruce Johnson indicated that he needed to acquire a firearm.  SFO Riordan explained that he believed that Bruce Johnson may use any firearm he obtained to engage in violent activity.

The remainder of SFO Riordan's affidavit discussed technical issues, such as how cellular providers can generate location information relative to a particular cellular device.  The affidavit was signed by SFO Riordan as well as the undersigned.

After receiving SAUSA Danis's application and SFO Riordan's affidavit, the undersigned issued a PLW directing the provider associated with 314-326-3138 to provide to the government the requested records, including location data.  (Evid. Hrg. 6.20.2019 Gov't Exh. 1c)

### B.      Application for First Extension

On May 16, 2018, SAUSA Danis submitted an application for a first extension of the PLW associated with 314-326-3138.  (Evid. Hrg. 6.20.2019 Gov't Exh. 2a)  This application was made to the Honorable Patricia L. Cohen, U.S. Magistrate Judge.  SAUSA Danis requested a 45-day extension of the previously authorized PLW.  Accompanying the application was an affidavit of SFO Betz.

---

[14] The number 314-745-9785 is discussed above in connection with the wiretap for TT #7.

SFO Betz's affidavit for the First Extension did not refer to or rely on the above-referenced jailhouse call between Bruce Johnson and Jeremy Dickerson.  Rather, SFO Betz's affidavit included additional factual details not included in SFO Riordan's earlier affidavit.  Significantly, these additional facts were not derived from the initial PLW warrant.  For example, SFO Betz's affidavit added information from another confidential source, CS-3.  The information regarding CS-3 concerned the broad contours of the drug trafficking organization, and specifically stated that Bruce Johnson was involved in the sale of narcotics with his brother.  (See Evid. Hrg. 6.20.2019 Gov't Exh. 2b at 7)  SFO Betz's affidavit repeated the information regarding CS-4 and CS-5, including that CS-5 had observed Bruce Johnson in possession of narcotics.   SFO Betz's affidavit also summarized a conversation, intercepted on April 29, 2018, between Demetrius Johnson (using 314-297-6983)[15] and Bruce Johnson (using 314-326-3138), in which Bruce Johnson asked his brother to contact a source of supply.  (Id. at 8)  SFO Betz's affidavit also summarized a conversation, intercepted on May 10, 2018, between Christopher Pipes (using 314-391-3871)[16] and Bruce Johnson (using 314-326-3138) in which Pipes and Bruce Johnson discussed a quantity of drugs sold.  (Id. at 8-9)  The affidavit was signed by SFO Betz and Judge Cohen.

After receiving SAUSA Danis's application and SFO Betz's affidavit, Judge Cohen issued a first extension of the PLW, directing the provider associated with 314-326-3138 to provide the requested records, including PLI data.  (Evid. Hrg. 6.20.2019 Gov't Exh. 2c)

---

[15] The number 314-297-6983 is discussed above in connection with the wiretap for TT #9.

[16] The number 314-391-3871 is discussed above in connection with the wiretap for TT #10.

### C.    **Application for Second Extension**

On June 27, 2018, SAUSA Danis applied to the undersigned for a second extension of the PLW.  This application was supported by an affidavit of SFO Riordan.  This June 27th affidavit included information attributed to CS-3, CS-4, and CS-5.  This affidavit also included a detailed description of a controlled purchase of fentanyl from Bruce Johnson on April 12, 2018, by CS-3.  According to the affidavit, Bruce Johnson provided CS-3 with the number 314-326-3138 to contact him for future transactions.  According to CS-3, Bruce Johnson was armed with an assault rifle during the transaction.  (<u>See</u> Evid. Hrg. 6.20.2019 Gov't Exh. 3b at 8)  SFO Riordan's June 27th affidavit also summarized a conversation intercepted on May 28, 2018, between Gregory Ivy (using 314-391-3871) and Bruce Johnson (using 314-326-3138), in which Ivy reportedly contacted Bruce Johnson to retrieve narcotics to sell.  (<u>See id.</u> at 9)  The affidavit also summarized a call intercepted on May 30, 2018, between Pipes (using 314-391-3871) and Bruce Johnson (using 314-326-3138), in which Pipes and Bruce Johnson discussed a firearm, and a later conversation between Pipes and Bruce Johnson in which Bruce Johnson advised Pipes of a firearm that was for sale.

After receiving SAUSA Danis's application for a second extension and SFO Riordan's affidavit, the undersigned issued a second extension of the PLW, directing the provider associated with 314-326-3138 to provide the requested records, including PLI data.  (Evid. Hrg. 6.20.2019 Gov't Exh. 3c)

### D.    **Hearing Testimony and Additional Findings of Fact Relative to Bruce Johnson's Request for *Franks* Hearing**

At the June 20th evidentiary hearing, the government presented the testimony of SFO Riordan.  The undersigned limited Bruce Johnson's cross-examination of SFO Riordan, finding that Bruce Johnson was not entitled to a hearing pursuant to <u>Franks v. Delaware</u>, 438 U.S. 154,

155-56 (1978).  The undersigned, however, allowed Bruce Johnson to make a record concerning the key factual basis for his <u>Franks</u> argument, namely that SFO Riordan's affidavit for the initial PLW was materially misleading.  As noted, Bruce Johnson contends that the affidavit omitted key factual context relative to his jailhouse conversation with Dickerson.  In particular, Bruce Johnson contends that the affidavit suggested that, after learning from Dickerson that the police had asked Dickerson about Demetrius Johnson, Bruce Johnson called Demetrius Johnson using the phone that was the subject of the PLW, when, in fact, he must have used a different phone.

Based on the hearing testimony and the parties' post-hearing memoranda, for purposes of deciding Bruce Johnson's request for a <u>Franks</u> hearing, the undersigned finds the following facts: (1) Dickerson was in jail and his call to Bruce Johnson was recorded consistent with jail policy; (2) Bruce Johnson was speaking with Dickerson using a cell phone with the number 314-326-3138 (the subject of the PLW); (3) because he was in jail, it was not possible for Dickerson to participate in a three-way call from jail; (4) someone called Demetrius Johnson while the recorded call between Bruce Johnson and Dickerson continued; (5) because three-way calls are not possible, the call to Demetrius Johnson must not have been made from 314-326-3138 because the call between Bruce Johnson and Dickerson would have terminated but it did not terminate; and (6) Demetrius Johnson was, in fact, made aware of the information that Dickerson provided to Bruce Johnson.  A recording of this somewhat complex scenario was submitted to the Court.  (<u>See</u> Evid. Hrg. 6.20.2019 Gov't Exh. 4)  That recording is consistent with the foregoing facts.

Additional findings of fact are included in the following discussion and analysis of issues presented.

## DISCUSSION AND ANALYSIS OF ISSUES PRESENTED

### I.   Motions to Suppress Wiretap Evidence – Demetrius Johnson and Pipes
[ECF Nos. 359, 417]

Demetrius Johnson asks the Court to suppress evidence resulting from the wiretap orders directed at TT #1, #2, and #6-12.  Demetrius Johnson argues that these wiretap orders should not have been issued because the government failed to satisfy the statutory requirement of "necessity."  In the alternative, he contends that the evidence should be suppressed because the government failed to adhere to appropriate procedures to minimize the interception of non-pertinent conversations.   Pipes seeks suppression of wiretap evidence associated with TT #6-11 for failure to satisfy the necessity requirement.

#### A.   General Legal Principles – Title III Wiretaps

Title III of the Omnibus Crime Control and Safe Streets Act of 1968, codified at 18 U.S.C. § 2510, et seq., allows the interception of wire, oral, or electronic communications under certain circumstances.  If the required circumstances are satisfied, and upon proper application of a federal law enforcement officer who has been authorized to make such application by the United States Attorney General (or a lawful designee), a United States District Judge may enter an order authorizing electronic surveillance.  See 18 U.S.C. § 2518 (procedures of interception of wire, oral, or electronic communications).  Courts presume valid authorization unless the person challenging the surveillance makes a prima facie showing that it was not so authorized.  See United States v. O'Connell, 841 F.2d 1408, 1416 (8th Cir. 1988).[17]

_____

[17] Under Title III, an "aggrieved person" can move to suppress the contents of intercepted communications and evidence derived therefrom.  See 18 U.S.C. § 2518(10)(a).  As used in Title III, an "'aggrieved person' means a person who was a party to any intercepted wire, oral, or electronic communication or a person against whom the interception was directed."  18 U.S.C. § 2510(11).  The government does not dispute that Demetrius Johnson and Pipes are "aggrieved persons" relative to the challenged wiretap evidence.

Each wiretap application must include the following information:

**(a)** the identity of the investigative or law enforcement officer making the application, and the officer authorizing the application;

**(b)** a full and complete statement of the facts and circumstances relied upon by the applicant, to justify his belief that an order should be issued, including (i) details as to the particular offense that has been, is being, or is about to be committed, (ii) except as provided in subsection (11), a particular description of the nature and location of the facilities from which or the place where the communication is to be intercepted, (iii) a particular description of the type of communications sought to be intercepted, (iv) the identity of the person, if known, committing the offense and whose communications are to be intercepted;

**(c)** a full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous;

**(d)** a statement of the period of time for which the interception is required to be maintained. If the nature of the investigation is such that the authorization for interception should not automatically terminate when the described type of communication has been first obtained, a particular description of facts establishing probable cause to believe that additional communications of the same type will occur thereafter;

**(e)** a full and complete statement of the facts concerning all previous applications known to the individual authorizing and making the application, made to any judge for authorization to intercept, or for approval of interceptions of, wire, oral, or electronic communications involving any of the same persons, facilities or places specified in the application, and the action taken by the judge on each such application; and

**(f)** where the application is for the extension of an order, a statement setting forth the results thus far obtained from the interception, or a reasonable explanation of the failure to obtain such results.

18 U.S.C. § 2518 (1).  A wiretap order may issue upon a proper application if the District Judge

determines:

**(a)** there is probable cause for belief that an individual is committing, has committed, or is about to commit a particular offense enumerated in section 2516 of this chapter;

**(b)** there is probable cause for belief that particular communications concerning that offense will be obtained through such interception;

(**c**) normal investigative procedures have been tried and have failed or reasonably appear to be unlikely to succeed if tried or to be too dangerous;

(**d**) [with certain exceptions] there is probable cause for belief that the facilities from which, or the place where, the wire, oral, or electronic communications are to be intercepted are being used, or are about to be used, in connection with the commission of such offense, or are leased to, listed in the name of, or commonly used by such person.

18 U.S.C. § 2518 (3).  The probable cause required for a wiretap "does not differ from that required by the fourth amendment for a search warrant."  United States v. Macklin, 902 F.2d 1320, 1324 (8th Cir. 1990); see also United States v. Thompson, 690 F.3d 977, 984-85 (8th Cir. 2012).

When reviewing a challenge to a wiretap, courts test the application materials in a "practical and commonsense fashion."  United States v. Garcia, 785 F.2d 214, 221 (8th Cir. 1986) (citations and quotations omitted).  Thus, "[a] reviewing court must accord broad discretion to the decision to authorize wiretapping …." Id. (citations omitted).  "Moreover, those against whom the resulting [wiretap] evidence is admitted have the burden of proving the wiretapping was unlawfully obtained or used." Id. (citation omitted).   "[A] party challenging the validity of a federal wiretap order must show a substantial, not just technical, deviation from the requirements of the statute."  United States v. Fairchild, 189 F.3d 769, 774 (8th Cir. 1999) (citing United States v. Moore, 41 F.3d 370, 374-76 (8th Cir. 1994)).

## B.    **Necessity of Wiretaps**

Demetrius Johnson and Pipes contend that the affidavits in question failed to meet the requirement that normal investigative procedures have been tried and failed or reasonably appear to be unlikely to succeed if tried or to be too dangerous.  See 18 U.S.C. § 2518(1)(c); United States v. West, 589 F.3d 936, 939 (8th Cir. 2009) (explaining that a District Judge issuing a

wiretap order "must find that 'normal investigative procedures' have failed or 'reasonably appear to be unlikely to succeed if tried or to be too dangerous'") (quoting 18 U.S.C. § 2518(3)).  This requirement is commonly referred to as "necessity."

It is well-established that "the necessity requirement does not mandate that the government 'exhaust all possible techniques before applying for a wiretap.'"  United States v. Colbert, 828 F.3d 718, 725 (8th Cir. 2016) (quoting Macklin, 902 F.2d at 1326-27 ("The government is simply not required to use a wiretap only as a last resort.")), cert. denied, 137 S. Ct. 1599 (2017).  "Indeed, the Eighth Circuit has interpreted the necessity requirement to 'restrict wiretaps to situations in which they are necessary as well as reasonable, but not to require the government to show the exhaustion of specific or all possible investigative techniques before wiretap orders could be issued.'"  United States v. Woodson, 2018 WL 7150388 at *13 (E.D. Mo. Nov. 21, 2018) (quoting United States v. Thompson, 690 F.3d 977, 986 (8th Cir. 2012)).  Rather, the "necessity requirement prevents the government from routinely using wiretaps 'as the initial step in an investigation.'"  Colbert, 828 F.3d at 725 (quoting United States v. Thompson, 210 F.3d 855, 858-59 (8th Cir. 2000)).

In large drug conspiracy cases, "[i]f law enforcement officers are able to establish that conventional investigatory techniques have not been successful in exposing the full extent of the conspiracy and the identity of each coconspirator, the necessity requirement is satisfied."  West, 589 F.3d at 939 (citation and quotation omitted); see also United States v. Milliner, 765 F.3d 836, 840 (8th Cir. 2014) (quoting West), cert. denied, 135 S .Ct. 2910 (2015).

Necessity is not determined using hypertechnical or exacting standards.  Thus, the use of seemingly boilerplate language in an affidavit for a wiretap does not contradict an applicant's claim of necessity.  For example, "[a]n affidavit that explains 'in general terms why some of the

-30-

procedures have failed in other investigations and would likely fail in [the instant case],' satisfies § 2518(1)(c) if it contains 'particular instances in which normal procedures were used and did in fact fail.'"  Colbert, 828 F.3d at 726 (quoting Macklin, 902 F.2d at 1327).  Similarly, an "affidavit's use of explanations that 'are common to most drug conspiracy investigations … does not necessarily preclude a finding of necessity under section 2518(1)(c).'"  Id. (quoting Thompson, 210 F.3d at 859 (noting drug investigations can suffer from "common investigatory problems")).  "Drug crime is necessarily harder to detect [and investigate] because it is difficult to witness and does not create victims who are compelled to come forward and report the crime." United States v. Milliner, No. 4:11 CR 263 RWS (TIA), 2013 WL 5105783 *6 (E.D. Mo. Sept. 12, 2013), aff'd, 765 F.3d 836 (8th Cir. 2014).  Because "a large drug conspiracy may be more difficult to fully prosecute without a wiretap, the scope of the investigation must be considered in determining necessity for the wiretap."  Id. (citing United States v. Jackson, 345 F.3d 638 (8th Cir. 2003)); see also United States v. Smith, 909 F.2d 1164, 1166 (8th Cir. 1990)).  Therefore, if the government establishes "that conventional investigatory techniques have not been successful in exposing the full extent of the conspiracy and the identity of each coconspirator, the necessity requirement is satisfied."  United States v. Turner, 781 F.3d 374, 382 (8th Cir.) (quoting West, 589 F.3d at 939), cert. denied, 136 S. Ct. 208 (2015).

When viewed in the context of the foregoing standards, the undersigned finds that each of the challenged wiretap applications and affidavits satisfies the necessity requirements.  The affidavits outlined the broad goals of the investigation, which unsurprisingly included exposing the full extent of the drug trafficking conspiracy, such as identifying sources of supply, and which would be furthered by using wiretaps.

-31-

Demetrius Johnson's argues that, even before the government applied for its first wiretap, conventional investigatory techniques had been successful and no wiretaps were ever necessary. His arguments, however, do not actually address the detailed and specific allegations regarding necessity that were included in each affidavit at issue.  He never squarely addresses the government's proffered goal of identifying higher level sources of supply and the methods of those sources.  Instead, he contends that "[i]nstead of explaining how these investigative procedures 'failed' or 'why they reasonably appeared unlike to succeed if tried,' the Government simply makes clear that it wanted more."  [ECF No. 417 at 7]  This contention is simply an unsupported conclusion and is not a fair characterization of the actual allegations included in any of the affidavits at issue.  His arguments disregard the "broad discretion" that must be afforded a District Judge's "decision to authorize wiretapping," see Garcia, 785 F.2d at 221, and imply that the issuing District Judges did not hold the government to the standards applicable to Title III applications.  The undersigned has reviewed each affidavit at issue, including the specific representations concerning necessity, and finds that each of the affidavits included sufficient facts to provide more than a substantial basis for the issuing District Judge to conclude that the government had, in fact, met the legal necessity requirement.

It is manifest on this record that the government did not seek wiretap authority as a first resort.  See Colbert, 828 F.3d at 725.  Rather, each affidavit in issue included detailed, fact-based reasons why wiretap evidence was necessary to expose the full extent of the conspiracy, including the higher-level distributors and methods of operation.  See Turner, 781 F.3d at 382. The later affidavits explained how the earlier wiretaps had been fruitful and why further wiretaps were necessary, for example, to identify newly discovered sources of supply.  And contrary to Demetrius Johnson's claim that the government simply wanted more evidence when it was not

necessary, the government discontinued monitoring when such monitoring only reinforced that

which it already knew.  For example, the government discontinued monitoring of TT #6 after it

concluded that TT #6 was being used by lower level members of the conspiracy.  (See Evid. Hrg.

6.17.2019 Gov't Exh. 29 at 9)  Finally, the Court must consider the overall context of the

wiretaps at issue, which were directed at a large-scale, drug trafficking organization.  Defendants

cannot credibly argue that conventional investigatory techniques alone would have exposed the

full extent of the conspiracy.  See Turner, 781 F.3d at 382; West, 589 F.3d at 939; Milliner, 2013

WL 5105783 at *6.

        The District Judges who issued the wiretap orders in question were entitled to credit the

affiants' representations regarding the necessity of using wiretaps to further the overall goals of

the government's investigation.

        Having fully reviewed each of the challenged wiretap applications, affidavits, and orders

in a "practical and commonsense fashion," see Garcia, 785 F.2d at 221, and having accorded

appropriate discretion to the judicial decisions authorizing each wiretap, see id., the undersigned

finds that Demetrius Johnson and Pipes have failed to show any meaningful deviation from the

requirements of the statute.  See Fairchild, 189 F.3d at 774.  The undersigned finds, therefore,

that the defendants' challenges based on a failure of necessity cannot be sustained.

        **C.**    **Minimization**

        Demetrius Johnson also argues that the government failed to use adequate minimization

procedures.  Although he raises several arguments, he does not identify any interceptions that

should have been minimized but were not.  Rather, without offering any examples, he argues that

there were communications gathered "that do not even arguably concern the offenses under

investigation," and that the measures taken "were dreadfully insufficient."  [ECF No. 417 at 8]
The record before the Court refutes this characterization.

Like necessity, "minimization" is somewhat of a term of art in the context of Title III
litigation.  The concept is easily stated—when conducting a wiretap pursuant to Title III, law
enforcement must take steps to minimize the interception of communications that are not
contemplated by the wiretap order.  Thus, in addition to the various prerequisites for obtaining
wiretap authority, Title III requires certain post-authorization duties, including a duty to
minimize unauthorized interceptions.  See 18 U.S.C. § 2518(5) (requiring interceptions to be
"conducted in such a way as to minimize the interception of communications not otherwise
subject to interception").  The "minimization" requirement does not require perfection, but rather
objectively reasonable efforts.  See United States v. Smith, 909 F.2d 1164, 1167 (8th Cir. 1990)
(noting that the court's analysis of a minimization challenge resolves into the reasonableness of
the monitoring agents' actions).  In Macklin, the Eighth Circuit explained that –

> In considering whether the government's conduct was reasonable, the reviewing
> court must consider a variety of factors including the scope of the enterprise, the
> agent's reasonable expectation of the content of a call, the extent of judicial
> supervision, length and origin of a call, and use of coded or ambiguous language….
> More extensive wiretapping is reasonable when the investigation focuses on
> determining the scope of a widespread conspiracy….  The same is true when the
> conversations are in the jargon of the drug trade….  Thus, the government's conduct
> could be reasonable even if the total number of conversations intercepted contained
> a high percentage of nonpertinent calls….

902 F.2d at 1328 (emphasis supplied, internal citations omitted).

There is no single best way to minimize wiretap interceptions, and the minimization
requirement in "[s]ection 2518(5) 'does not forbid the interception of all nonrelevant
conversations, but rather instructs the agents to conduct the surveillance in such a manner as to
minimize the interception of such conversations."  West, 589 F.3d at 939 (quoting Scott v.

-34-

United States, 436 U.S. 128, 140 (1978)).  Moreover, some communications, for example, include both pertinent and nonpertinent content.  Thus, courts have approved reasonable and periodic spot-checking as a reasonable means of minimizing conversations.  See United States v. Ozar, 50 F.3d 1440, 1448 (8th Cir. 1995) (citing authority for spot-checking).

Each of the wiretap orders at issue herein included some version of the following "minimization" requirement:  "IT IS FURTHER ORDERED … that all monitoring of wire and/or electronic communications shall be conducted in such a way as to minimize the interception and disclosure of the communications intercepted to those communications relevant to the pending investigation."  (See, e.g., Evid. Hrg. 6.17.2019 Gov't Exh. 57 at 7)  At the June 17th evidentiary hearing, the government introduced evidence and testimony demonstrating the steps taken to adhere to this requirement.  For example, and as discussed in the findings of fact above, before monitoring began on each target telephone, SAUSA Danis provided a minimization guidance letter to the agent who submitted the affidavit with respect to that target telephone.  These guidance letters outlined in considerable detail the steps to be followed to minimize the interception of non-pertinent communications.  The letters provided specific guidance so that monitors could also identify and minimize the interception of potentially legally privileged communications.   The government also conducted minimization meetings to reinforce the guidance and each person monitoring the wiretaps was required to read not only the guidance letter, but also the affidavit, application, and order authorizing the wiretap.  Each monitor was also required to sign and date a log/roster certifying that the monitor had read and understood the minimization requirements outlined in SAUSA Danis's minimization guidance letters.  Based on the credible testimony of S/A Olmstead and SFO Betz at the evidentiary

hearing on June 17, 2019, it was also established that monitoring did not occur 24-hours each day, but was conducted during likely hours of relevant communications.

The minimization procedures employed were not, as Defendant argues, "dreadfully insufficient." Rather, those procedures were extensive and meaningful and complied with the orders authorizing the wiretaps, as well as the relevant provisions of Title III.

While cross-examining the government's witnesses at the June 17th evidentiary hearing, Demetrius Johnson's counsel inquired about the use of contractors to conduct the monitoring, and pointed out that some of the minimization guidance letters required the FBI to maintain custody of the original recordings until they were provided to the Court. SFO Betz acknowledged the use of contractors and that the FBI did not maintain custody of the original recordings. In his post-hearing memorandum, Demetrius Johnson argues that the use of contractors and the failure of the FBI to adhere to the requirements of some of the minimization letters entitle him to suppression.

Not all of the minimization guidance letters include the challenged FBI custody requirement. The guidance letters addressed to DEA S/A Olmstead require the DEA to maintain custody and the letters addressed to FBI SFO Betz require the FBI to maintain custody. But these letters do not create binding legal requirements apart from the court orders and Title III. (See, e.g., Evid. Hrg. 6.17.2019 Gov't Exh. 58)

None of the court orders authorizing the challenged wiretaps specifically required any particular agency (e.g., the FBI) to maintain custody of the interceptions. Where the orders refer to a government agency, those orders typically referred to both agencies together or collectively as "investigating agencies" or "DEA/FBI"). (See, e.g., Evid. Hrg. 6.17.2019 Gov't Exh. 21 at 5,

9)  Thus, Demetrius Johnson cannot show that the government failed to adhere to any minimization requirements included in the authorizing court orders.

Further, Title III does not require that a particular government agency conduct the monitoring or maintain custody.  Rather, § 2518(5) contemplates the very procedures the government used in this case.  More specifically, § 2518(5) provides that, "[a]n interception under this chapter may be conducted in whole or in part by Government personnel, or by an individual operating under contract with the Government, acting under the supervision of an investigative or law enforcement officer authorized to conduct the interception."  At the June 17th evidentiary hearing, SFO Betz credibly testified that, although much of the monitoring was conducted by contractors, there was always a supervising federal agent from the DEA or FBI available to answer questions regarding minimization should issues arise.  Demetrius Johnson cannot show that the government failed to follow any statutory minimization requirements.

Finally, in the Eighth Circuit, the appropriate remedy for a failure of the minimization requirement is not the suppression of all intercepted communications.  Rather, the appropriate remedy is the suppression of the specific communications that should have been, but were not, minimized.  See United States v. Cox, 462 F.2d 1293, 1301 (8th Cir. 1972); see also United States v. Ozar, 50 F.3d 1440, 1448 (8th Cir. 1995) (quoting Cox and reversing total suppression of wiretap evidence for failure to minimize interception of privileged calls).  Demetrius Johnson has not identified any communications that should have been, but were not, minimized.  Thus, Demetrius Johnson cannot show how any alleged government failure regarding minimization resulted in the government obtaining evidence it was not lawfully entitled to obtain.

For the foregoing reasons, based on the record before the Court, the undersigned finds that the steps taken to minimize the interception of non-pertinent and privileged communications

were reasonable and adequate.  Demetrius Johnson's motion to suppress for inadequate minimization cannot be sustained.

### D.    Summary of Conclusions – Bruce Johnson and Christopher Pipes's Motions

The undersigned finds that the government satisfied the necessity requirement for each of the challenged wiretaps.  The undersigned further finds that the government followed satisfactory procedures to minimize the chances of intercepting nonpertinent and privileged communications.  Therefore, the undersigned respectfully recommends that the Court deny Demetrius Johnson's and Pipes's motions to suppress wiretap evidence.

## II.    Motion to Suppress Wiretap Evidence – Rhodes [ECF No. 419]

Rhodes filed a general motion to suppress all wiretap evidence.  The undersigned finds that Rhodes lacks standing to challenge any wiretap evidence, and even if he has standing, any challenge would fail.

Under Title III, an "aggrieved person" can move to suppress the contents of intercepted communications and evidence derived therefrom.  See 18 U.S.C. § 2518(10)(a).  As used in Title III, an "'aggrieved person' means a person who was a party to any intercepted wire, oral, or electronic communication or a person against whom the interception was directed."  18 U.S.C. § 2510(11).  Thus, "[s]tanding to challenge evidence obtained under Title III is limited to persons whose Fourth Amendment rights were violated by the surveillance."  United States v. Turner, 2012 WL 12527326 at *13 (E.D. Mo. Dec. 28, 2012) (citing Alderman v. United States, 394 U.S. 165, 171-76 n.9 (1969)).[18]

_____

[18] In Turner, our Court explained that "aggrieved person" does not encompass any person against whom the evidence might be introduced at trial, noting that "Congress specifically considered the broader definition of 'aggrieved person' … when it rejected a proposed amendment … which would have given standing to any person against whom wiretap evidence is offered…."  Turner, 2012 WL 12527326 at *14 (citation and internal quotations omitted)

In <u>United States v. Civella</u>, 648 F.2d 1167 (8th Cir. 1981), the Eighth Circuit considered motions to suppress wiretap evidence brought by individuals who were not intercepted and who were not named as "targets" in the interception orders even though their names were mentioned in the affidavits in support of the application.  <u>Id.</u> at 1172.  The Court explained that those defendants were not entitled to suppression, "simply because the overall investigation may have in some way been directed against [them]."  <u>Id.</u> (citing <u>Rakas v. Illinois</u>, 439 U.S. 128, 134-35 (1979)).

At the evidentiary hearing in this matter, the parties agreed that none of Rhodes's conversations or text messages were intercepted as a result of any of the wiretaps at issue.  Accordingly, the undersigned finds that Rhodes was not an interceptee on any of the wiretaps at issue in this case.  Furthermore, the undersigned has reviewed each of the wiretap applications at issue in this matter.  None of those wiretap orders or applications identified Rhodes as a "target" of the interceptions.  Accordingly, the undersigned finds that Rhodes is not an aggrieved person who may move to suppress wiretap evidence.

Even if Rhodes is an aggrieved person with standing, for at least the reasons outlined above relative to his co-defendants' challenges to the wiretap orders in this case, Rhodes's general challenges would fail on the merits.  Each of the wiretap applications, affidavits, and orders discussed above are supported by ample probable cause and satisfy the requirements of necessity and minimization.  Accordingly, the undersigned recommends that the Court deny Rhodes's motion to suppress wiretap evidence.

### III.    Motion to Suppress Phone Location Evidence and Request for *Franks* Hearing – Bruce Johnson [ECF No. 420]

Bruce Johnson asks the Court to suppress all evidence obtained pursuant to the Phone Location Warrant ("PLW") issued for cell phone 314-326-3138.  Bruce Johnson focuses his

arguments on the affidavit submitted for the initial PLW, and contends that any evidence flowing from the first and second extensions of the PLW must be suppressed as the fruit of a poisonous tree.  Bruce Johnson raises two, related arguments in support of his suppression motion.  In particular, he contends that the affidavit submitted by SFO Riordan was materially misleading and that, if corrected, the affidavit is lacking in probable cause.  He also contends that the officers are not entitled to good faith reliance.  The government counters that the affidavit is not misleading, and that the affidavit includes ample probable cause despite the allegedly misleading passage.  The government further contends that, in any event, the good-faith exception to the exclusionary rule should apply if the Court finds the affidavit lacking in terms of probable cause.

### A.     The Initial PLW for 314-326-3138

"The Fourth Amendment requires a showing of probable cause before a search warrant may be issued."  United States v. Williams, 477 F.3d 554, 557 (8th Cir. 2007).  Normally, "[w]hen a magistrate relies solely on an affidavit to issue the warrant, only that information which is found within the four corners of the affidavit may be considered in determining the existence of probable cause."  United States v. Farlee, 757 F.3d 810, 819 (8th Cir.) (internal quotations and citation omitted), cert. denied, 135 S. Ct. 504 (2014).  In Franks v. Delaware, the Supreme Court explained that, in certain circumstances, the Fourth Amendment entitles a defendant to an evidentiary hearing regarding the accuracy of a search warrant affidavit.  See 438 U.S. 154, 155-56 (1978).

A defendant is not automatically entitled to an evidentiary hearing under Franks.  "There is … a presumption of validity with respect to the affidavit supporting [a] search warrant."  Id. at 171.  A defendant's conclusory allegations of false or omitted information are insufficient.  Id. "In order to be entitled to a hearing under Franks the defendant must make a substantial

preliminary showing of a false or reckless statement or omission and must also show that the alleged false statement or omission was necessary to the probable cause determination." United States v. Crissler, 539 F.3d 831, 833 (8th Cir. 2008) (internal citations and quotations omitted). See also United States v. Gater, 868 F.3d 657, 659-60 (8th Cir.), cert. denied, 138 S. Ct. 751 (2017); United States v. Mashek, 606 F.3d 922, 928 (8th Cir.  2010).  A defendant's substantial "showing is not easily made."  United States v. Engler, 521 F.3d 965, 969 (8th Cir. 2008); see also United States v. Bradley, 924 F.3d 476, 481 (8th Cir. 2019).  "Allegations of negligence or innocent mistake will not suffice to demonstrate reckless or deliberate falsehood."  Mashek, 606 F.3d at 928 (citing Franks, 438 U.S. at 171); see also Conant, 799 F.3d at 1200 (explaining that recklessness can be inferred where the omitted material is clearly critical to any finding of probable cause).

> Where a defendant argues that the affidavit omitted material facts,
>
> the Fourth Amendment requires a hearing where the defendant makes a substantial preliminary showing that (1) the affiant omitted facts with the intent to mislead the issuing judge, or omitted the facts in reckless disregard of the fact that the omissions would mislead, and (2) the affidavit, if supplemented by the omitted information could not support a finding of probable cause.

Gater, 868 F.3d at 659-60 (citing United States v. Conant, 799 F.3d 1195, 1200 (8th Cir. 2015)). To determine whether statements were made with reckless disregard for the truth, courts consider "whether, after viewing all the evidence, the affiant must have entertained serious doubts as to the truth of his statements or had obvious reasons to doubt the accuracy of the information he reported."  United States v. Butler, 594 F.3d 955, 961 (8th Cir. 2010); see also Gater, 868 F.3d at 659-60 (addressing omissions); United States v. Clapp, 46 F.3d 795, 799 (8th Cir. 1995).

Bruce Johnson focuses his <u>Franks</u> arguments on one passage of SFO Riordan's affidavit,[19] namely the March 17, 2018, recorded jailhouse telephone conversation between Bruce Johnson and Jeremy Dickerson, who was then being housed in the St. Louis City Justice Center.  As outlined in the facts above, pages 6-8 of SFO Riordan's affidavit (Evid. Hrg. 6.20.2019 Gov't Exh. 1b) summarized a phone call between Bruce Johnson and Dickerson. There is no dispute that Bruce Johnson was using the telephone number that was the subject of the PLW application, namely 314-326-3138.  (Evid. Hrg. 6.20.2019 Tr. at 17)  During that conversation, Dickerson described the circumstances of his arrest and told Bruce Johnson that the police asked him about Demetrius Johnson.  In response, Bruce Johnson stated, "I'm fittin to call Demetrius right now."  (<u>Id.</u> at 7)  SFO Riordan's affidavit interpreted the March 17, 2018, conversation between Dickerson and Bruce Johnson as follows:

> Dickerson was explaining to Bruce JOHNSON that he (Dickerson) fled from the police after acquiring narcotics from Demetrius JOHNSON and was arrested after he (Dickerson) was involved in an accident.  The Police Officers who arrested Dickerson questioned him about his involvement with Demetrius JOHNSON. <u>Upon hearing this, Bruce JOHNSON contacted Demetrius JOHNSON to make him aware of the knowledge the Police had relative to his criminal activities.</u>

(<u>Id.</u> at 8; emphasis supplied)  Bruce Johnson contends that this last sentence is materially misleading.  In particular, Bruce Johnson contends that this sentence suggests that Bruce Johnson contacted Demetrius Johnson using the subject telephone number—314-326-3138—when that was not possible because three-way calls involving prisoners such as Dickerson are not allowed. At the June 20th evidentiary hearing, Bruce Johnson made clear that it was his position that the inference that he used 314-326-3138 to call his brother and warn him about what he learned from

---

[19] As originally filed, Bruce Johnson's motion to suppress also took issue with other aspects of the affidavit.  Those other issues were clarified at the June 20th evidentiary hearing and Bruce Johnson confirmed that the focus of his <u>Franks</u> issue was SFO Riordan's account of Dickerson jailhouse phone call on March 17, 2018.  (<u>See</u> Evid. Hrg. 6.20.2019 Tr. at 16)

Dickerson is the lynchpin to any probable cause finding.  Stated differently, Bruce Johnson contends that, if he did not use 314-326-3138 to warn his brother, then there is no probable cause to support the issuance of a PLW for Bruce Johnson's cell phone (314-326-3138).

The government appears to concede, at least for <u>Franks</u> purposes, that the conversation between Dickerson, Bruce Johnson, and Demetrius Johnson must have involved another telephone in addition to the subject cell phone with the number 314-326-3138.  But even accepting that Bruce Johnson did not use the 314-326-3138 cell phone to contact Demetrius Johnson, Bruce Johnson is not entitled to a <u>Franks</u> hearing for several reasons.

First, the undersigned finds that SFO Riordan's affidavit was literally true.  The hearing testimony and the jail house recording (Evid. Hrg. 6.20.2019 Gov't Exh. 4) establish that, upon learning from Dickerson that the police were asking about Demetrius Johnson, Bruce Johnson and Dickerson spoke with Demetrius Johnson and advised Demetrius Johnson of the situation. Second, the undersigned finds that, at worst, any omission as to how Demetrius Johnson was called was merely negligent and, therefore, Bruce Johnson is not entitled to a <u>Franks</u> hearing. <u>See</u> <u>Mashek</u>, 606 F.3d at 928.  Third, and perhaps most importantly, even assuming that the omission of the details was intentional, the undersigned disagrees with Bruce Johnson's contention that this omission was critical to any probable cause finding.  Even if the passage at issue were supplemented to clearly indicate that 314-326-3138 was not used to contact and advise Demetrius Johnson, there would remain probable cause to issue the PLW for the cell phone with the number 314-326-3138.

"[P]robable cause … depends on whether, under the totality of the circumstances, there is a fair probability evidence of a crime will be found in a particular place."  <u>United States v. Faulkner</u>, 826 F.3d 1139, 1144 (8th Cir. 2016) (quotations and citations omitted).  Probable

cause is "a fluid concept—turning on the assessment of probabilities in particular factual contexts—not readily, or even usefully, reduced to a neat set of legal rules." Illinois v. Gates, 462 U.S. 213, 232 (1983).  A reviewing court "may draw reasonable inferences from the totality of the circumstances in determining whether probable cause exists to issue a warrant." United States v. DeFoggi, 839 F.3d 701, 706 (8th Cir. 2016) (quotation omitted), cert. denied, 138 S. Ct. 2643 (2018); see also United States v. Petruk, 929 F.3d 952, 959 (8th Cir. 2019) (noting that the review is to determine whether the issuing judge "had a substantial basis for concluding that a search would uncover evidence of wrongdoing") (internal quotation and citation omitted).  It is well-established that, when the issuing judge relies on a supporting affidavit to issue a search warrant, "only that information which is found within the four corners of the affidavit may be considered in determining the existence of probable cause." United States v. Solomon, 432 F.3d 824, 827 (8th Cir. 2005) (citations and quotations omitted); see also United States v. Farlee, 757 F.3d 810, 819 (8th Cir.), cert. denied, 135 S. Ct. 504 (2014); United States v. Gladney, 48 F.3d 309, 312 (8th Cir. 1995).  Finally, "[t]he affidavit should be examined under a common sense approach and not in a hypertechnical fashion." Solomon, 432 F.3d at 827 (citation and quotations omitted); see also United States v. Ventresca, 380 U.S. 102, 109 (1965); Gladney, 48 F.3d at 312 (explaining that "[a]ffidavits must be read in a common-sense and realistic fashion") (citations and quotations omitted).

The PLW at issue directed the wireless service provider (in this case Sprint) to provide a variety of information, including location information, subscriber information, and call records associated with the number 314-326-3138.  Probable cause to justify compelled disclosure of such information may flow from at least two general factual scenarios.  First, the government may show that the cell phone itself has been, and continues to be, used in the crime(s) under

investigation, and evidence of the crime(s) will likely be found in the requested records.  Second, the government may show that a suspect is involved in, and continues to be involved in, the crime(s) under investigation, the suspect is using the cell phone in question, and evidence of the crime(s) will likely be found in the requested records.  These two general scenarios are not mutually exclusive and could overlap.

SFO Riordan's affidavit provided ample information to conclude that the subject cell phone had been used in connection with Demetrius Johnson's drug trafficking activities.  For example, the affidavit explained that Demetrius Johnson was involved in narcotics trafficking and used multiple cell phones, including so called "dope phones," some of which were passed around.  (Evid. Hrg. 6.20.2019 Gov't Exh. 1b at 3-4)  Two confidential sources (CS-4 and CS-5)[20] provided additional information regarding Demetrius Johnson's drug trafficking activities and extensive use of cell phones.  (See id. at 4-5)

The affidavit also provided information to support a finding that Bruce Johnson had joined Demetrius Johnson's drug trafficking organization after being released from prison in January 2018.  SFO Riordan's affidavit explained how CS-4 identified Bruce Johnson and that CS-5 confirmed that Demetrius Johnson allowed Bruce Johnson to use the group's cell phones to conduct narcotic transactions to earn money since he (Bruce Johnson) had just been released from prison.  CS-5 also advised that he had observed Bruce Johnson in possession of illicit narcotics.  Thus, the affidavit provided a substantial basis to conclude that Bruce Johnson was a

---

[20] The reliability of the information provided by CS-4 and CS-5 is not seriously questioned by Bruce Johnson.  See Petruk, 929 F.3d at 959 (discussing reliability of confidential sources).  Rather, Bruce Johnson argues about what the affidavit does not include—any representation that CS-4 or CS-5 witnessed him use the subject cell phone at all.  While his observation is no doubt true, the Court must consider the entire affidavit, not just the observations and information from the two confidential sources.

member of Demetrius Johnson's drug trafficking organization and was using a cell phone in connection with drug trafficking activities.

The affidavit also provided information to support a finding that Bruce Johnson was using the subject cellular telephone in question—314-326-3138—at the time of the application. The PLW application was made on April 2, 2018.  SFO Riordan's affidavit summarized two intercepted phone calls in which it is not disputed that Bruce Johnson had recently used the subject cellular telephone to talk with Jeremy Dickerson (on March 17, 2018) and Demetrius Johnson (on March 27, 2018).  The call with Jeremy Dickerson involved a discussion of drug trafficking activities related to Demetrius Johnson's organization.  In that call, Jeremy Dickerson told Bruce Johnson that he obtained narcotics from Demetrius Johnson, and after his arrest, the police asked him about Demetrius Johnson.  The affidavit makes clear that, upon learning that the police had inquired about his brother, Bruce Johnson took steps to notify Demetrius Johnson of this inquiry.  While the probable cause would have been stronger if Bruce Johnson used the subject cell phone to call his brother to advise him that the police were asking about him, it is not fatal to a finding of probable that Bruce Johnson notified his brother by other means.

The undersigned finds that, regardless of how Bruce Johnson notified Demetrius Johnson—whether he used the subject cellular telephone or not—the conversation with Dickerson and subsequent call to Demetrius Johnson comprise a conversation in furtherance of Demetrius Johnson's drug trafficking conspiracy.  And it is not disputed that the first part of that conversation was conducted using the subject cellular telephone, namely 314-326-3138.

Putting all of this together, even if the allegedly misleading information in the affidavit is corrected, SFO Riordan's affidavit would supply facts to support the following conclusions:  (1) Demetrius Johnson was the leader of a drug trafficking organization; (2) Bruce Johnson was

-46-

Demetrius Johnson's brother and was a member of that organization; (3) Demetrius Johnson provided a cell phone to Bruce Johnson to use to sell drugs to make money; (4) as of late March 2018, Bruce Johnson was using the subject cellular telephone to discuss both personal and drug-related activities; and (5) there is a fair probability that evidence of Bruce Johnson's participation in the drug trafficking crimes under investigation would be found in the information and records requested by the PLW.  For example, the toll and subscriber records requested would disclose the other phone numbers, and by inference other co-conspirators, Bruce Johnson interacted with. Similarly. the location records would disclose whether the subject telephone, and by inference Bruce Johnson, was associated with other persons and physical locations relevant to the drug trafficking activities under investigation.

For the foregoing reasons, therefore, the undersigned finds that Bruce Johnson is not entitled to a <u>Franks</u> hearing.  The undersigned further finds that SFO Riordan's affidavit supplies sufficient probable cause to support the issuance of the initial PLW—the affidavit supplied a substantial basis to conclude that the warrant would uncover evidence of wrongdoing.  <u>See</u> <u>Petruk</u>, 929 F.3d at 959.

Having found that SFO Riordan's affidavit supplied sufficient probable cause to justify the issuance of the initial PLW for 314-326-3138, there is no need to consider whether the good-faith exception to the exclusionary rule would apply.

       **B.**      **<u>First and Second Extensions of the PLW for 314-326-3138</u>**

Bruce Johnson contends that the evidence obtained pursuant to the first and second extensions of the PLW should be suppressed as the poisonous fruit of the initial PLW.  Inasmuch as the undersigned has found that the initial PLW was properly issued, there is no basis to suppress evidence from the first and second extensions of the PLW for 314-326-3138.

Moreover, as outlined in the findings of fact above, the first and second extensions do not rely on the jailhouse conversation involving Dickerson and Bruce Johnson.  To the contrary, the extensions supply additional facts that do not derive at all from the initial PLW.  Thus, even if the evidence obtained pursuant to the initial PLW were to be suppressed, the evidence obtained from the extensions is not tainted by any defect with the initial PLW.

### C.     Conclusions – Bruce Johnson's Motion to Suppress

Bruce Johnson is not entitled to a Franks hearing due to omitted information in the affidavit for the PLW at issue.  The undersigned finds that the initial application for the PLW was supported by probable cause.  The undersigned further finds that the first and second extensions of that PLW were supported by probable cause independent of any information obtained pursuant to the initial PLW.  Accordingly, the undersigned recommends that the Court deny Bruce Johnson's motion to suppress evidence from the PLW for 314-326-3138.

### RECOMMENDATIONS

Accordingly,

**IT IS HEREBY RECOMMENDED** that Defendant Demetrius Johnson's Motion to Suppress the Contents of Electronic Surveillance [ECF No. 417] be **DENIED**.

**IT IS FURTHER RECOMMENDED** that Defendant Christopher Pipes's Motion to Suppress Interception of Electronic Communication [ECF No. 359] be **DENIED**.

**IT IS FURTHER RECOMMENDED** that Defendant Christopher Rhodes, Jr.'s Motion to Suppress Electronic Surveillance Evidence [ECF No. 419] be **DENIED**.

**IT IS FURTHER RECOMMENDED** that Defendant Bruce Edward Johnson's Motion to Suppress Evidence Derived from Electronic Surveillance and Request for Franks Hearing [ECF No. 420] be **DENIED**.

-48-

The parties are advised that they have fourteen (14) days in which to file written objections to this Memorandum, Order, and Recommendations, unless an extension of time for good cause is obtained, and that failure to file timely objections may result in a waiver of the right to appeal questions of fact.  See Thompson v. Nix, 897 F.2d 356 (8th Cir. 1990); see also 28 U.S.C. § 636(b)(1)(A), Fed. R. Crim. P. 59(a).

Pretrial proceedings have not concluded in this matter.  Consistent with the undersigned's scheduling orders, the foregoing Memorandum, Order, and Recommendation addresses only motions to suppress wiretap and electronic surveillance evidence.  The trial of this matter will be set by the Honorable Catherine D. Perry, Senior United States District Judge, at the conclusion of all pretrial proceedings.

/s/ *John M. Bodenhausen*

JOHN M. BODENHAUSEN
UNITED STATES MAGISTRATE JUDGE

Dated this ____13th_____ day of _September_, 2019

## Exhibit List - Evidentiary Hearing June 17, 2019

**Peabody Wiretap Hearing**

**Exhibit List**

| TARGET TELEPHONE #1 AND #2 | | |
|---|---|---|
| #1: (314) 704-7992 | | |
| #2: (314) 319-9166 | | |
| Target: Marquise Cortez Brown | | |
| BINDER #1 | Affiant: DEA SA Julie Olmsted | |
| **Exhibit #** | **Description** | **Witness/Affiant** |
| 1 | Initial Application | DEA SA Julie Olmsted |
| 2 | Initial Affidavit (redacted-discovery version) | DEA SA Julie Olmsted |
| 3 | Initial Order | DEA SA Julie Olmsted |
| 4 | Initial Minimization Letter | DEA SA Julie Olmsted |
| 5 | Amended Application | DEA SA Julie Olmsted |
| 6 | Amended Affidavit (redacted-discovery version) | DEA SA Julie Olmsted |
| 7 | Amended Order | DEA SA Julie Olmsted |
| 8 | 1st 10-day Report | DEA SA Julie Olmsted |
| 9 | 2nd 10-day Report | DEA SA Julie Olmsted |
| 10 | 3rd 10-day Report | DEA SA Julie Olmsted |
| 11 | Continued Application | DEA SA Julie Olmsted |
| 12 | Continued Affidavit (redacted-discovery version) | DEA SA Julie Olmsted |
| 13 | Continued Order | DEA SA Julie Olmsted |
| 14 | 4th 10-day Report | DEA SA Julie Olmsted |
| 15 | 5th 10-day Report | DEA SA Julie Olmsted |
| 16 | 6th 10-day Report | DEA SA Julie Olmsted |
| 17 | Sealing Application | DEA SA Julie Olmsted |
| 18 | Sealing Order | DEA SA Julie Olmsted |
| **TARGET TELEPHONE #6, #7, and #8** | | |
| #6: (314) 537-0649 | | |
| #7: (314) 745-9785 | | |
| #8: (314) 699-1323 | | |
| Target: Demetrius Johnson | | |
| BINDER #2 | Affiant: FBI SFO Michael Betz | |
| **Exhibit #** | **Description** | **Witness/Affiant** |
| 19 | Application | FBI SFO Michael Betz |
| 20 | Affidavit (redacted-discovery version) | FBI SFO Michael Betz |
| 21 | Order | FBI SFO Michael Betz |
| 22 | Minimization Letter | FBI SFO Michael Betz |
| 23 | 1st 10-day Report | FBI SFO Michael Betz |
| 24 | 2nd 10-day Report | FBI SFO Michael Betz |
| 25 | 3rd 10-day Report | FBI SFO Michael Betz |
| 26 | Sealing Application (TT#6) | FBI SFO Michael Betz |
| 27 | Sealing Order (TT#6) | FBI SFO Michael Betz |
| **TARGET TELEPHONE #7, #8, and #9** | | |

| | #7: (314) 745-9785<br>#8: (314) 699-1323<br>#9: (314) 297-6983<br>Target: Demetrius Johnson<br>Affiant: FBI SFO Michael Betz | |
|---|---|---|
| BINDER #3 | | |
| **Exhibit #** | **Description** | **Witness/Affiant** |
| 28 | Application | FBI SFO Michael Betz |
| 29 | Affidavit (redacted-discovery version) | FBI SFO Michael Betz |
| 30 | Order | FBI SFO Michael Betz |
| 31 | Minimization Letter | FBI SFO Michael Betz |
| 32 | 4th and 1st 10-day Report | FBI SFO Michael Betz |
| 33 | 5th and 2nd 10-day Report | FBI SFO Michael Betz |
| 34 | 6th and 3rd 10-day Report | FBI SFO Michael Betz |
| 35 | Sealing Application | FBI SFO Michael Betz |
| 36 | Sealing Order | FBI SFO Michael Betz |
| | **TARGET TELEPHONE #10**<br>#10: (314) 391-3871<br>Target: Christopher Pipes<br>Affiant: DEA SA Julie Olmsted | |
| BINDER #4 | | |
| **Exhibit #** | **Description** | **Witness/Affiant** |
| 37 | Application | DEA SA Julie Olmsted |
| 38 | Affidavit (redacted-discovery version) | DEA SA Julie Olmsted |
| 39 | Order | DEA SA Julie Olmsted |
| 40 | Minimization Letter | DEA SA Julie Olmsted |
| 41 | 1st 10-day Report | DEA SA Julie Olmsted |
| 42 | 2nd 10-day Report | DEA SA Julie Olmsted |
| 43 | 3rd 10-day Report | DEA SA Julie Olmsted |
| 44 | Sealing Application | DEA SA Julie Olmsted |
| 45 | Sealing Order | DEA SA Julie Olmsted |
| 46 | Renewed Application | FBI SFO Michael Betz |
| 47 | Renewed Affidavit (redacted-discovery version) | FBI SFO Michael Betz |
| 48 | Renewed Order | FBI SFO Michael Betz |
| 49 | Renewed Minimization Letter | FBI SFO Michael Betz |
| 50 | 4th 10-day Report | FBI SFO Michael Betz |
| 51 | 5th 10-day Report | FBI SFO Michael Betz |
| 52 | 6th 10-day Report | FBI SFO Michael Betz |
| 53 | Renewed Sealing Application | FBI SFO Michael Betz |
| 54 | Renewed Sealing Order | FBI SFO Michael Betz |
| | **TARGET TELEPHONE #11 and #12**<br>#11: (314) 541-4797<br>#12: (314) 941-6539<br>Target: Andre Smallwood<br>Affiant: DEA SA Julie Olmsted | |
| BINDER #5 | | |
| **Exhibit #** | **Description** | **Witness/Affiant** |
| 55 | Application | DEA SA Julie Olmsted |

| 56 | Affidavit (redacted-discovery version) | DEA SA Julie Olmsted |
| 57 | Order | DEA SA Julie Olmsted |
| 58 | Minimization Letter | DEA SA Julie Olmsted |
| 59 | 1st 10-day Report | DEA SA Julie Olmsted |
| 60 | 2nd 10-day Report | DEA SA Julie Olmsted |
| 61 | 3rd 10-day Report | DEA SA Julie Olmsted |
| 62 | Sealing Application | DEA SA Julie Olmsted |
| 63 | Sealing Order | DEA SA Julie Olmsted |